Good morning, Your Honors, and may it please the Court, my name is Jonathan Kona, I represent the United States of America. This Export Clause case turns on the meaning of the statutory phrase, Coal Produced. If that phrase, Coal Produced, means Coal Extracted or Coal Manufactured, there is no dispute that the statute passes constitutional muster. By the same token, if the phrase, Coal Produced, means Coal Sold or Coal Exported, there is no dispute that the statute presents constitutional problems. So when did the government decide on its most recent interpretation on the expressing term today? The government's position with respect to the imposition of the coal has always been consistent. Plaintiffs raise the point that we have been inconsistent, but they're focusing on the timing of the assessment or calculation of the tax, as opposed to the imposition of the tax. Wait a minute, you've been consistent? What was your position? I thought in Drummond, your position was it's based on the sale. The produced means sale. It's consistent with sale. With respect, Your Honor, we did not take that position. Drummond was about the timing of the assessment of the tax. It was the excess moisture deduction case, and that turned upon the way you calculate the tax. It was not about the imposition. Counsel, in Drummond it says production could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to the buyer's door. Was that not the position of the government in Drummond? The government did not use that language in the brief. Now, I do grant that that language of the court does appear to cast a broader net than simply assessment. It also appears to cover the imposition. But the government did not use that language in its brief. Are you sure you're not saying that what was decided before the government's brief? Your Honor, my point simply is this twofold. Number one, the government has never taken the position that the imposition of the tax, as opposed to the assessment, is at sale. No, but it's the decision that binds us. Your Honor, even if this court feels bound by that language in Drummond, with respect, that language supports our position here because what Drummond says is that the statute's ambiguous. The statute could be interpreted either as covering until the pit, the buyer's door, or could cover just extraction. The court said it was ambiguous. And plaintiffs embrace that language. They agree it's ambiguous. Well, if the statute's ambiguous, then with respect, the canon of constitutional avoidance must apply. And under that canon, this court is compelled to adopt the interpretation that avoids the constitutional concerns, irrespective of what position the agency has taken. Leaving aside the constitutional deference question, under national code and other cases, is it the government's position that even if the government had pressed the position in Drummond that was just cited by Judge Moore, it is free or it's entitled to deference in light of the ambiguity of the statute to a change in the position? I know you're maintaining it's not a change, but let's assume that it's a change. We think we are entitled to deference, but with respect, the court should not and need not reach the deference issue because under DiBarlo, the Supreme Court's decision in DiBarlo, the avoidance canon trumps deference. So irrespective of what position the agency is taking now or in the past, that doesn't matter. The court is compelled to adopt the interpretation that avoids the constitutional concerns. In DiBarlo, of course, the Supreme Court disregarded the agency's very interpretation in that case because the agency's interpretation in that case gave rise to constitutional concerns. So under DiBarlo, under the avoidance canon, it wouldn't even matter what position the agency took in the past. The court would be compelled to salvage, to save Congress's statute by adopting the interpretation that avoids the constitutional concerns. And what's telling is that after we cited DiBarlo in our opening brief, plaintiff doesn't cite DiBarlo at all. They completely ignore what is the most dispositive case at issue today. Under DiBarlo, this court is compelled to adopt the interpretation that avoids the constitutional concerns. Did you cite DiBarlo to the court of the plaintiff's judgment? We didn't cite DiBarlo. We cited St. Cyr on page 34 of our brief, and we invoked the avoidance canon. We didn't cite DiBarlo. We cited it in our opening brief here as well as our reply. Plaintiffs don't cite it at all. In which respect, DiBarlo is dispositive. There's plaintiffs' agreement. But in counsel, isn't it true that in Drummond and these other cases where the court took a position on the meaning of the export clause, there were no constitutional restraint issues. The court was not confronted with any in any of those cases. So that court, the D.C. Circuit, didn't have an opportunity to consider the statute in this light. That's absolutely correct, Judge Moore. The court didn't have to grapple with the issues that are before the court here today. The court simply held the statute is ambiguous and then applied Chevron. But if, in fact, the statute is ambiguous, then the court here can't apply Chevron. Under DiBarlo, it has to adopt an interpretation that avoids the constitutional concerns. And I would assume that the doctrine of constitutional restraint, as you understand it, we can't really bend the language like a crystal. But you're saying that the language is ambiguous and thus the doctrine of constitutional restraint would apply and it would trump even an inconsistent position possibly taken by the agency. That's right, Judge Moore, with one caveat. We don't think the language is ambiguous with respect to the imposition claim. We think produced unambiguously means manufactured or extracted for a couple of reasons that we'll get into. But even assuming that... But that position, at least, is not consistent with the position that the government pressed and drummed, correct? No, it's consistent with the position you pressed and drummed. I grant you it is inconsistent with some language in the court's opinion and drumming. But how could the government do a position and drumming, leaving aside what words can be used to an argument, had to have been predicated on your view that it produced included things, right? That was the government's position. With respect, Your Honor, drumming was simply about the excess moisture reduction and the timing of the calculation of the tax. It's the distinction this court recognized in New Farm, the distinction between the timing of the assessment and the imposition of the tax. Well, did the government take a position and drum as to what the definition of produced was? We did not with respect to the imposition, Your Honor. What we said in drumming is that, consistent with that statute, the timing of the calculation is at the time of sale. We did not say... First of all, we did not say produced means the time of sale or sold or anything like that. We didn't say that. But also, as Judge Moore pointed out, these issues weren't even present in drumming. So there's no occasion for us or the court to opine upon what the word produced actually means in terms of imposition. But, Your Honor, I'm willing to assume arguendo the statute is ambiguous to avoid these knotty questions of reconciling a position here with drumming. I think a position can be reconciled, but I'll assume arguendo that the statute's ambiguous in all of its forms, and I'll assume arguendo we always took that position. Even making those assumptions, this court is compelled to reverse the decision below under the avoidance canon, under DiBarlo, under St. Cyr. But we're not required to make the wrong decision in order to avoid the difficult question. Let me ask you on the issue of tax. Is there any argument as to... Are these proceeds absolutely dedicated to reclamation, or are they more a tax than to the general cost of the treasury? It goes into a fund. I can't say every penny goes into reclamation because I know that at least some money goes to the health care of retired mine workers and their dependents, but the primary purpose of this fund, which is where the money goes into, is reclamation. And is that verified? It seems to me that the strongest argument intellectually on the government side is that, in fact, if we're doing circus mining, we should pay the consequences thereof. Whatever else you do with the coal, you do not. But if, in fact, there is a question as to the use of these persons to repair the circus damage, then your position is much more difficult. I don't believe there is a question in that. Plaintiffs have not suggested that the money is being used for general copper. The money is being used, to my understanding, primarily for reclamation, but there is some money, at least, which is going to the health care of the mine workers. Is that in the statute? I don't recall offhand, Your Honor. I can check with my colleagues and give you an answer to that for rebuttal. But this is one of the reasons, Your Honor, for why, if there's any ambiguity, in addition to avoidance, this is one of the reasons why this Court should construe the statute to mean coal extracted or manufactured as opposed to sold, and in many reasons. One, of course, is the overarching purpose of the statute, which is reclamation. But there are other reasons, Your Honor. In ordinary parliaments, the word produced means manufactured. If one looks at the dictionary, under produced, the synonym is manufactured, not sold. Another point is the neighboring words in the statute. What the statute says is coal produced by surface coal mining or by underground mining. And surface coal mining and underground mining, of course, are methods of extracting coal. They are not methods of selling coal. In addition, Your Honor, if one were to look beyond the statute and look at the regulation, there are additional factors to consider, one of which is this tax falls not just on coal sold, but it also falls on coal transferred and coal used. So, for instance, if a utility company had a mine of coal and extracted the coal and used it for its utility, it wouldn't be selling the coal, but you still have a tax because the tax isn't a sales tax. But there's no constitutional provision that it means so you can't have such a tax. And that's the issue here, isn't it? Oh, Your Honor, there's only a constitutional problem if the phrase coal produced meant coal sold. And I'll just point out the many reasons why, if there's ambiguity here, it's a very reasonable interpretation of the statute to say it means coal extracted. Counsel, how do you deal with the situation? Coal produced means coal extracted, and I understand clearly your argument, but the way the regulations are structured, you are only ultimately going to have the imposition of a tax at the time of transfer or sale. What about the stockpiling idea? Because I was a little puzzled by that. If I were to extract a bunch of coal and stockpile it, I would actually, my liability would actually never kick in. Technically, under your definition of the statute, it should kick in when extracted, but given the way the regs implement the statute, there would actually never be a time when my liability would in fact come due. So how do you reconcile that? Sure, Your Honor. Well, there is a liability, the tax imposed at the production of the extraction. You're right, you wouldn't be paying the tax until after you sold it.  Theoretically, and also in the Ninth Circuit decision in Rogin, the tax would not be collected if you theoretically held on to the good and never sold it. The tobacco in Liggett could have been stockpiled as well and never sold, at which point you're never actually paying the tax. But nonetheless, the Supreme Court in Liggett and the Fourth Circuit in Reynolds and the Ninth Circuit in Rogin nonetheless all recognize that it's still a tax on the production, it's not a tax on the sales. It's the distinction between the imposition and the assessment of the tax. I was on the panel on New Farm. I don't know if it was New Farm who saw the video. Is there anything in New Farm that responds to Judge Moore's question? I wouldn't say responds to Judge Moore's question, but I think responds to the concerns that Judge Newman mentioned earlier. New Farm is very helpful here because Newman recognized, sorry, New Farm recognized the distinction between the timing of the assessment of the tax and the timing of the imposition of the tax. And playing this entire case really falls down to, despite what they say, really comes down to the timing of the assessment is collected at sale, but that's constitutionally irrelevant under New Farm, under Liggett, under Reynolds. It's just irrelevant. Let me, before your time runs out, one quick question, and that is that under Bowen, is it your view that the de Bartolo constitutional avoidance principle trumps anything that we read in Bowen? It trumps everything that you read in Bowen. Bowen which talks about not deferring to certain, I mean, assuming you find the statute ambiguous, Bowen talks about not deferring to agency litigation positions to a certain extent. Absolutely, Your Honor, because the agency interpretation, again, is irrelevant because under de Bartolo, irrespective of what our position is now, irrespective of what it was before, irrespective of what other courts have held, if there is a reasonable interpretation of the statute that avoids constitutional concerns, then under de Bartolo, this court must adopt that reasonable interpretation. And one final point I'd like to make, which is, if there's any constitutional question here, and there really shouldn't be, it really is a question of plaintiffs' own creation because under the regulations, and their case, again, comes down to timing the assessment, but under the regulations, there's nothing requiring that coal operators calculate the tax after it's been cleaned as opposed to at the mine when it's been pulled out. They have the option of calculating the weight and calculating the tax at the time of extraction, but also the option of calculating it later. And this is done to make it more administratively convenient for the coal operators, and it also allows them to choose the lower of the two taxes. But clearly— You're saying they have the option of paying the taxes more quickly. Pardon? I think I hear you saying, yes, of course they have the option. They can just pay the tax and go away. They can pay the tax upon extraction, which might be a higher tax. They have an option. But that's why we're here, isn't it? Whether the tax is owed. Let's hear it from the other side. I'll save you a better time. Thank you, Your Honor. Mr. Horowitz. Thank you, Mr. Court. The government in its brief has stated that this tax is imposed on coal operators. The Drummond Court specifically and directly addressed the meaning of coal produced. Therefore, the Drummond Court addressed what this tax is imposed on. But, counsel, I think that the Drummond Court, you would agree, said that the statute was ambiguous, right? Yes. At that time, the statute was ambiguous. And, well, if the statute was ambiguous, it's only less ambiguous because of a government-adopted position after that due to deference. But, nonetheless, the statute itself would probably still be ambiguous, right? Even though the government says it's regulated or whatnot. Anyway, in Drummond, the issue of constitutional avoidance wasn't there because the export portion of this case wasn't there. That's correct. So, are you suggesting that under the doctrine of constitutional avoidance, once any court or government has taken a position, the doctrine of constitutional avoidance cannot be used to come to the exact opposite result when the statute is ambiguous? That is our position. And two cases that the government did not mention in its presentation here, the Nacimento case, which relied on the Supreme Court's 2005 Martinez decision to submit, are directly on point with regard to that issue. And Bargillo is an opposite. The Martinez court, the Supreme Court, indicated that the meaning of a statute cannot be rendered a chameleon depending on the presence or absence of constitutional concerns in a given case. But doesn't that go to the notion that you can't twist the statute like a pretzel to make it constitutional rather than an ambiguous statute that needs to be distributed away to assure its constitutionality? Well, Martinez involved an ambiguous statute. And in an earlier case, Zambita's case, I may not be pronouncing it correctly, the Supreme Court utilized and applied one definition under the constitutional avoidance doctrine. Martinez's case followed, and the court recognized that there would be no constitutional impediment to applying the other potential definition of that ambiguous statute. Yet the court still refused to apply that other definition because the first definition had already been put in place. So there was no reason for the court not to apply that other definition of an ambiguous statute but for the fact that the contrary definition had been utilized in the earlier case. And Nacimento recognizes that the constitutional avoidance doctrine cannot create that same situation where you have two competing meanings sitting side by side. And that's what we would have in this case as a result of the constitutional avoidance doctrine. It seems to me that the Martinez case is quite different. There you have interests of starring decisis, and you don't have ultimately a constitutional concern. Even if the initial definition was selected out of concern with a constitutional conflict, once that decision is in place and well-established and being applied and people are utilizing it, couldn't it be possible that what the Supreme Court did in that case would say, well, this definition is sufficiently in place, the statute is ambiguous, and even if the definition was adopted because of the doctrine of constitutional avoidance, we're going to leave it alone? Well, we believe that the First Circuit addressed this point. We believe that was the correct decision. It specifically said that that's not what constitutional avoidance is used for. And for example, if 30 years ago in Drummond, this case had been before the Drummond court, the constitutional avoidance doctrine would have applied because it would not have created this chameleon-like statute at that time. But it would do so here, and we feel that that's exactly what the Nascimento Court speaks to. But regardless of, even for the sake of argument, let's say that the court says, well, we have to construe this as extractive based on constitutional avoidance. That does not retroactively change the fact that for the past 30 years, the government has indeed construed coal produced to be coal sold. It has embodied that in its regulations. Construction, or was it in fact just a matter of convenience for the miner, for the producer, that when they don't know if it's going to be exported, they take it to export, to pay a tax out of proceeds before they have the proceeds to construe the coal. Well, we believe that with regard to constitutional analysis, matters of easing burdens, or was that the best result that people could think of governs the constitutional analysis. Indeed, in the Harbor Maintenance case, the government argued that creating this tax and structuring it the way it was, was really the best workable, most workable approach. And this court indicated that, well, that may have been the case, but we have to look and see how this tax operates and does it violate the export clause. And we submit that the same thing would apply here. Tell me, I misunderstand the point you were making before the question. Dick Bartolo says when an otherwise acceptable construction of a statute would raise serious constitutional problems, the court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. How do we get around applying that well-established principle to this case? I think the key term is otherwise permissible or otherwise reasonable, plausible. Here, when it would result in having two competing constructions in place simultaneously, we submit that that is not a plausible result. Constitutional avoidance requires that. And two other constructions simultaneously in place is based on? Well, you have the Drummond construction, which remains in place. They are continuing to tax the sale. And the tonnage sold, which is very often quite different from the tonnage manufactured, and indeed can include materials that were never in the ground in the first place. Counsel, suppose the government had never rendered a prior construction of this statute, never suggested a prior construction. Drummond is off the table. And this is the first time they're construing this statute. And the court is presented with, well, which construction should we adopt? Constitutional avoidance would result in one construction, which is constitutional, and another one, which fails constitutionality. Would you agree that under those circumstances that the court should be adopting the one that is going to result in the constitutionality of the statute? Quite possibly, but that would be a different case, Your Honor. Quite possibly? Is that a yes? Yes. Okay. But that would be a different case. That's not this case. Why? Because there's no judicial? Because of Drummond? Well, because of Drummond and because of the way that the agency has, in fact, applied that tax as a tax upon sale and embodied that construction in its regulations. But, counsel, what about in the Bartolo case, there's a section where the Supreme Court is talking about the board was urged to construe the statute in light of the asserted constitutional considerations but thought it was constrained by its own prior authority and cases in the courts of appeals as well as by these breastplankers, blah, blah, blah. So don't we have this similar situation in the Bartolo where the board believed it couldn't adopt the construction, which would avoid unconstitutionality because it already had its own precedent and precedent of the court of appeals going the other way. Nonetheless, the Supreme Court ultimately said, yes, you have to adopt the one that results in unconstitutionality. Why isn't that the same? Tell me how it's different. Well, as you said, the Supreme Court said that the board felt constrained. The Supreme Court, in fact, looked at the two cases that the board felt constrained to follow. And in one of those cases, the Supreme Court said it was factually distinguishable. In that case, the union activity that was being examined was not the simple hand-dealing. It was hand-dealing and picketing. So there was not, in fact, a conflict between decisions by virtue of the application of the constitutional avoidance doctrine. The other decision that the board felt constrained by, the Supreme Court said, we've looked at that decision. The alleged conflicting interpretation was contained in one sentence of unpersuasive thickness. So it was not even a holding of that other held court. So the Bartolo did not involve the type of conflict through the application of the avoidance doctrine that we would have here between extraction versus the tax upon sale that's been in place for the last 30 years, pursuant to the agency's regulations. So, let's go back to the purpose of the statute. This is still troubling me. There is no dispute that the purpose of the statute is that those who do surface money will contribute to a fund to reclaim the surface. Is that right? It goes into a fund pit. As to generally, even if some of the funds have been rigid for minor welfare. That is perhaps the primary purpose of reclamation. Historically, there had been a tremendous unappropriated balance, so funds were not being expended on reclamation to a large extent. But a significant portion, I believe it was some $70 million a year, based on the interest that was earned on that unappropriated balance, was going to the Miners Combined Fund. But regarding the tax issue, the tax versus fee was considered by the lower court, but it has been considered by many other circuits, and they've uniformly confirmed that it is in fact a tax, because it's not a user fee, there's no benefit being provided to the coal companies, but rather the courts have concluded that it's a tax used for a purpose that benefits the public generally. Well, right, but unless the case actually turns on whether we decide whether this is a tax or a fee, then this is my concern with the case. That those who make the mess, you're saying that if you export the product of the mess, you don't have to pay your share to clean up the mess you've created? Well, you know, a similar argument was made in the harbor maintenance case. Shippers use the harbors, or exporters use the harbors. Let's just talk about this case and try to understand the purpose of the legislation as we look at the stage at which the tax or the fee is what has gotten us where we are. But we're trying to understand the congressional purpose, because there is, of course, no purpose to tax exporters, no purposes to reclaim the land, no people contribution to those who do this kind of money. Congress, and the Drummond Court also touched on this, Congress wanted to raise money for reformation, but they did not have any particular intent as to what would be taxed to raise that money. That was left... That's in the statute. Well... That's in the statute that we're now considering. Yes, it says... We will tax what you mine, but we don't have to pay the taxes. Well, it says we tax... And if you don't sell it for export, then in fact, you do pay the tax when it's sold. Yes, the statute imposes it on coal produced, but nowhere in the legislative history does it indicate what is to be taxed, what coal produced means. That's why the Drummond Court had to go through that exhaustive analysis. Do you agree the ordinary meaning of coal produced would be coal extracted, and that the government's original position in Drummond was a bit of a stretch? It can be extracted. I don't think it's a tremendous stretch. Produced is different from extracted. Produced can mean getting the product into the sales market, so I don't think it's that much of a stretch. Doesn't produced kind of take manufactured or extracted? It just seems produced to me, it seems like a bit of a stretch to suggest that produced means sold. Those two words don't seem to be natural synonyms to me. Do you disagree? Again, it could perhaps go either way. The Drummond Court adopted the interpretation that was urged by OSM. Do you mean then you take the position the statute is ambiguous? In the sense that the Drummond Court said it was ambiguous, we agree that there's not the wiggle room that the government... I want to know, is your position in this case that the statute is ambiguous? Yes, because it doesn't say sold, but nor does it say extracted either, and that's the government's position as to what produced means. So if it's ambiguous, ordinarily an agency's interpretation, such as the one that's pressing here, would be a federal deference? The agency would be entitled if it desires to change its interpretation, and we believe that that's essentially, to the extent that this Court finds it's not a mere litigating position, it would be a change of interpretation in the briefs. We would harken back also... And so why is that? Why was it that it may not be required to help to give deference? But that would not result in a retroactive nullification of the violation that has arisen given their prior interpretation that has been in place undisturbed for the last 30 years. And indeed, I would refer to the 2004 final rule that OSM promulgated, which we believe demonstrates that OSM does in fact interpret cold produced to be an imposition on the sale, and precisely as the Drummond Court concluded, because in that case, OSM was anticipating that the reclamation fee would expire at the end of September 2004. Let me make sure I understand your most recent argument, and it is that if the statute is ambiguous and the agency, in your view, is changing its position from its prior position, which Drummond seems to suggest maybe it is, then you're saying that they're perfectly entitled to do that, but it doesn't automatically apply retroactively. It's the retroactivity to the application to your client that you're disputing. Well, we believe it cannot apply retroactively, but moreover, they can't just relabel it as extraction, because I think what we have to do— But you just said that they're free to change their— Well, yes, but they have to change their regulations to make sure that in practice they are in fact implementing what they're saying is their new interpretation. They can't just say we're now interpreting it differently. Oh, wouldn't you agree that under the regulations they would be permitted, under the statute, they would be permitted to say that coal produced equals coal extracted, but we're going to collect the money at the time of sale for simplicity purposes because you have a scale there, and that's the easiest opportunity in application for you all to weigh it. So while the tax actually attaches when you pull the stuff out of the ground, we'll let you actually pay it when it's more convenient for you because of the scale and everything else. You would agree that that would be appropriate for them to do, would you, as long as the focus is clear that the liability arises based on the extraction? Well, we believe that the way that they assess the tax, which is on the time it's sold, which can have no relation to what was extracted and indeed will cover impurities, if in coal that is sold, including post-extraction impurities, but that is inconsistent with the notion that this can be interpreted as an extraction tax. The way they are applying it. Okay, so suppose that the regulation said that coal produced equals coal extracted, and we leave it to the extractor to choose when he weighs it. He can either weigh it at the time he pulls it right out of the ground and gets a scale handy and then pay the tax, or he can weigh it when he gets to a convenient place with a scale, a light at the time of transfer or sale. Up until that point in time, we'll allow him to award payment. Isn't that kind of what the statute is? I mean, aren't you permitted under the statute in the regs to weigh it as soon as it comes out of the ground? Well, there really is no choice. We believe that that's a false argument. The regulations provide that the fee is to be based on the weight at the time of sale or in the absence of the sale, transfer, or use. We believe there is no choice. It directs you to pay it on what is sold. If you sell, the coal comes out, and it's clean enough, and you sell raw coal, that's what the tax is imposed on. If you're selling coal that's been processed, you sell it on that tonnage. Whether or not impurities have been added in the cleaning process, we believe there is no choice involved here. We do not see that in the regulatory scheme at all. Just one follow-up to Judge Moore's question. I think she asked the same question, but what you seem to introduce is kind of a retroactivity question. And I'm not quite clear on that. Even if you say that the agency can change its position, it can't do so retroactively, how does that play with the constitutional avoidance? Well, the agency, it's our position that ever since the enactment of the statute and the implementation of the regulations, that the agency has construed this as being a tax on the sale, a coal producer's tax on the sale of coal. And they have embodied that interpretation in their regulations, and they look to the tonnage sold, whether or not it includes post-extraction materials. And that's been in place, and that's how the tax has operated for the past 30 years. The agency decides, we want to have this to be an extraction tax. They can say, we now interpret coal produced to be extraction, but they have to actually implement it as an extraction tax. But they have the tax on coal sold for export. That is correct, Your Honor. So on the theory that it's because it was extracted. Well, I don't know that that's the reason why they did that. I don't know that they were necessarily cognizant of what was going on. We've seen other taxes that have been on the books for many years, and they're challenged many years later, and they're found to be unconstitutional under the Export Clause, for example, the Black Lung Tax. So I don't know that that's an indication that the agency has viewed this as an extraction tax. Can I ask one more question? I guess I still don't see that I clearly understand your answer to my earlier, or Judge Crow's more recent question, which is, suppose there's no dispute, the agency changed the position, and they're going to apply it to you retroactively, where do we factor the doctrine of constitutional avoidance into that in terms of the construction and application in this case? The agency was to say, we now want to interpret this as extraction. And it was clear and undisputed. I think there would be a problem for the agency to do that if they don't change the way they actually apply the tax. Assume they do. If they do, I think it would have to be on a going-forward basis. If they want to say, we're now going to treat this as an extraction tax and actually apply it as an extraction tax, they can't do that and say, but forget about how we've applied this for the last 30 years as a tax on sale. Thank you, Your Honor. If it would be okay for just a short amount of time, could you start with the retroactivity idea? Sure, Your Honor. Two points about that. Number one, the point is waived in the court because plaintiff never raised it here or in the court below. At the most, this court should have the lower court address on the green end, but the point is flawed in any event, because by retroactivity what they mean is we should not be allowed to apply this interpretation to this case. But in DiBarlo, after the Supreme Court adopted the interpretation that avoided constitutional concerns, they applied that interpretation to that very case. We're asking for the same application here. This case is resolved by DiBarlo. Plaintiff concedes the statute is ambiguous. Plaintiff embraces Drummond, which says the statute is ambiguous and can be interpreted to mean co-extracted. Under DiBarlo, the agency's prior interpretations are relevant. Prior judicial interpretations are irrelevant. All that matters is there is one interpretation which avoids constitutional concerns as plaintiff concedes. Okay, but this is the test case, which model plaintiff. There are a whole bunch of other extractors. Are they then off the hook? No one's off the hook, Your Honor, because this court should construe the phrase co-produced to avoid the constitutional concerns. And that means the phrase co-produced means co-extracted or co-manufactured. This case is resolved by the Supreme Court's decision to DiBarlo. Plaintiff concedes the statute is ambiguous and can be interpreted to avoid the constitutional concerns. Prior agency interpretations, which were consistent with our interpretation, but even if they were inconsistent, the prior agency interpretations cannot render Congress's statute unconstitutional. An agency cannot convert a constitutional statute into an unconstitutional statute. DiBarlo controls this case. Counsel, I imagine that you don't agree with the distinction that opposing counsel raised in response to my question about whether DiBartolo involved facts very similar to this where the board felt that adopting a different construction would actually be contrary to its own precedent in the original circuits, and therefore they avoided doing that as a current precedent. You can't avoid it if it's necessary to render the interpretation constitutional. He claims that that is not like the case we have here. I'm imagining you may not agree, but maybe you do. Can you respond to that? I certainly disagree. DiBarlo is on all fours with this case. Just like in DiBarlo, here we have, allegedly, an agency interpretation that is inconsistent with the constitutional interpretation. We assume arguendo prior agency interpretation is inconsistent with the constitutional interpretation. That's what we have in DiBarlo. And in DiBarlo, there are prior decisions from the courts of appeals, just like in this case with Drummond. And DiBarlo held that irrespective of the agency's interpretation, past and present, irrespective of prior judicial decisions, we have to, the court said, we have to adopt the interpretation that avoids the constitutional concerns, and the court did just that. And with respect, this court should do the same thing. The parties agree that there is an interpretation of the statute that avoids constitutional concerns, and Drummond agrees that this interpretation we're offering is reasonable. Because the statute's ambiguous, this court under DiBarlo simply has to adopt the interpretation that avoids the constitutional concerns. Thank you very much. If there are no further comments, please abstain from using the motion.